LUIGI VITELLI ELVEA, INC., ET AL. *v.* UNITED STATES

**No. 5661.**—Invoices dated Naples, Italy, April 11, 1936, etc.
Certified April 14, 1936, etc.
Entered at New York, N. Y., May 5, 1936, etc.
Entry No. 836213, etc.

(Decided June 19, 1942)

*Barnes, Richardson & Colburn* (*Albert Mac C. Barnes* and *Hadley S. King* of counsel); *Brooks & Brooks* (*Frederick W. Brooks, Jr.,* of counsel); *Lane & Wallace;* and *Strauss & Hedges* (*Eugene F. Blauvelt* of counsel); for the plaintiffs.
*Paul P. Rao,* Assistant Attorney General (*Daniel I. Auster,* special attorney), for the defendant.

CLINE, Judge: These seven appeals for reappraisement were consolidated for trial. The merchandise involved consists of canned peeled tomatoes and tomato sauce or paste imported from Italy during the period from April 14 to September 7, 1936.

At the beginning of the trial, counsel entered into an agreement with respect to the value of certain of the merchandise covered by

reappraisement 122960–A. On the basis of this stipulation, I find that the entered values are the dutiable values of the following items:

| Case No. | Description of merchandise |
| --- | --- |
| K 5 | 110 Cases boxes Peeled Tomatoes each containing 6 tins of 3500 gr. |
| Elvea | 50 Cardboard Boxes Tomato Sauce, each containing 24 tins of 1000 gr. |
| P 13 | 20 Cases boxes Tomato Paste, each containing 50 tins of 1000 gr. |

There were three other items on the same invoice upon which the importer made an advance upon entry to meet advances by the appraiser in other cases which involved an advance of 20 per centum for equalization of currency compensation or so-called compensatory premium such as was considered in *Ernesto Solari et al.* v. *United States*, 5 Cust. Ct. 449, Reap. Dec. 4943. The parties agreed that such advance was improper. On the basis of this stipulation I find that the importer's claimed values are the dutiable values of the following items on the invoice:

| Case No. | Description of merchandise |
| --- | --- |
| Elvea | 300 Cardboard Boxes Peeled Tomatoes, each 24 tins of 1200 gr. |
| L. V. C. | 500 Cardboard Boxes Peeled Tomatoes, each 48 tins of 500 gr. |
| L. S. C. | 200 Cardboard Boxes Peeled Tomatoes, each 60 tins of 300 gr. |

As to the remainder of the merchandise covered by the appeals, it is the contention of the plaintiffs that the goods should be valued on the basis of export value as defined in section 402 (d) of the Tariff Act of 1930 and that the entered prices correctly represent the export values of the goods. This merchandise was appraised on the basis of foreign value under section 402 (c) of the Tariff Act of 1930. The plaintiffs contend that no foreign values of the merchandise existed at the time of the shipments herein because the canned peeled tomatoes and tomato sauce or paste sold for consumption in Italy were of a different quality and had different characteristics from the goods prepared for exportation to the United States.

The merchandise was invoiced and entered at values in United States currency at either c. i. f. prices or f. o. b. Naples prices and the appraisements were all made in Italian currency.

Nine witnesses were produced by the plaintiffs in support of their contention. Witnesses Amerigo Vitelli, Michall De Rosa, Umberto Sorrentino, Dominic M. Ricardino, Anthony J. Bender, and Louis J. Scaramelli represented importers of such merchandise and the others were agents who take orders in this country as agents for foreign shippers. The witnesses representing the importers testified that they paid the prices in United States currency shown on their invoices; that weekly, and sometimes daily, they received offers from agents of

foreign manufacturers other than those from whom they purchased at the same prices at which they purchased, but sometimes there was a difference of not more than 5, 10, or 15 cents per case during the different months of the period; that they were satisfied that they paid the market value at all times; that some offers were made on the basis of c. i. f. prices which were higher than those made on the basis of f. o. b. Naples price, but all were in United States currency; that all shippers produce the same quality of merchandise and guarantee that the goods will pass the standards required by the United States Department of Agriculture. Those witnesses produced copies of their invoices with drafts attached showing payments of the amounts shown on their invoices. These were received in evidence and marked collective exhibits 1, 2, 3, 4, 5, 6, 7, 10, 14, and 15.

The witnesses connected with the agents of the Italian exporters produced copies of contracts they had made during the period of these importations and they were received in evidence and marked collective exhibits 8, 9, 11, 12, 13, and 18. These witnesses all agreed that the quality of the goods produced by the different packers was the same and that they, the agents, guaranteed that the merchandise they sold would be accepted by the United States Department of Agriculture. Some of them testified that the guarantee was not on the written contracts. An examination of the contracts shows that there is such a guarantee on some of the contracts in collective exhibits 8, 9, and 13. Some of these witnesses testified that the sales and contracts which they made had to be approved by the Italian shippers before they became effective. It appears from the evidence that some of these agents had also made purchases for their own account, copies of their own invoices being among the exhibits.

Witness Louis J. Scaramelli, who is an importer of canned tomatoes and tomato paste or sauce as well as an agent for a foreign shipper, testified that the merchandise invoiced as "Cirio Brand Peeled Tomatoes, 24 x 3 lbs. (1036 gr.)" on the invoices covered by reappraisements 132031–A and 132077–A was packed in number 3 cans, not 3-pound cans, as invoiced, and the cans contained 1,200 grams, and that the merchandise invoiced as "Cirio Brand Peeled Tomatoes 48 x 1½ lbs. (476 gr.)" on the invoice covered by reappraisement 132077–A, was packed in size 1½ cans, not 1½ pounds as invoiced, and they contained 1 pound 1 ounce each, which is 600 grams.

The witness testified further that he was in Italy in 1922, 1928, 1932, 1934, 1935, 1936, and 1937 and visited the plants of various canners of tomatoes and tomato paste; that in 1936 he visited the plants of F. Vitelli & Figli, Del Gaizo, and Cirio; that he supervised canning for 35 or 40 days; that in 1937 he received instructions from the Italian Chamber of Commerce to make an investigation of peeled tomatoes and tomato paste in Italy and he went there for the purpose

of making such an investigation, and, at that time, visited nine separate canning establishments, the principal shippers to the United States, and inspected the methods used; that he found that there was no change in the methods that had been in use by canners during the last 15 years; that the canning season begins about August 20 each year and ends the last of October; that shipments prior to September 1936, would be from the 1935 pack while those made in September or thereafter might be from the 1936 pack.

In explaining the process of canning peeled tomatoes shipped to the United States, the witness testified that tomatoes picked in the fields are put in crates and placed in warehouses or outside the factories, that produce being the run of the crop consisting of some tomatoes which are sound and fully ripe, some pale, some green, and some sunburned; that these are placed on a conveyor and all of the pale, sunburned, cracked, split, or unripe tomatoes, or those containing mold, are sorted out and the selected tomatoes are scalded, peeled, put in cans, cooked, then labeled and packed for shipment to the United States and are known as "fancy solid packed tomatoes"; that the regulations of the United States Department of Agriculture provide that not more than 1 square inch of skin appear in a can of tomatoes, and, when the Italian tomatoes are sound and ripe, practically all of the skin can be easily removed by the peeling, but, if a tomato is green or sunburned, the skin cannot be all removed.

The witness testified further that in packing tomatoes for home consumption in Italy, the packers use the run of the crop, including the green, light colored, and sunburned tomatoes from which the skins are not all removed and the percentage of skins in the can would be much higher than the requirements insisted upon by the United States Department of Agriculture and they cannot be imported into the United States; that the sizes of the cans of both peeled tomatoes and tomato paste prepared for use in Italy are different from those shipped to the United States and that Cirio uses flat cans for use in Italy which are a different shape from those shipped to the United States.

As to the tomato sauce or paste, the witness testified that only first quality, firm, ripe, sound, peeled tomatoes are used for making such merchandise to be shipped to the United States; that the tomatoes are cooked in big vacuum pans for 4 or 5 hours in order to get 28 per centum solids; that, when the vacuum pans are discharged, chemists take samples and analyze the paste to see if it is fit to be exported to the United States; that the United States Department of Agriculture requires that tomato paste contain not more than 50 per centum mold filament, although formerly the requirement was not more than 66 per centum; that 60 per centum mold means that there were used 5 pounds of rotten tomatoes in every 100 pounds of fruit;

that if tomatoes are kept 3 or 4 days in the yard they crack and mold; that he had been present in Cirio's plant when the chemists tested paste manufactured for the United States market and they wrote down the results which he saw showing that the mold content was as low as 15 per centum.

The witness testified further that, in making tomato paste for consumption in Italy, the packers use the run of the crop and the tomatoes discarded in the selection of tomatoes for packing and shipping to the United States and also the peelings taken off the tomatoes used for canning; that ordinarily the mold in such tomato paste would be 70 to 90 per centum and the paste would not be permitted entry into the United States; that it has a different taste from that shipped to America.

The witness produced a copy of a circular issued by the United States Department of Agriculture showing the specifications of tomato paste required before such merchandise may be entered. This copy was received in evidence and marked exhibit 17. It reads as follows:

UNITED STATES DEPARTMENT OF AGRICULTURE
FOOD AND DRUG ADMINISTRATION
*Washington, D. C.*

*May 14, 1931.*

To MANUFACTURERS OF TOMATO PRODUCTS:

The food and drugs act defines a food product as adulterated if it consists in whole or in part of a decomposed vegetable substance. In the application of this provision of the law to tomato products, the Department in 1916 announced that until public notice to the contrary was given, proceedings would not be recommended on the basis of microscopic mold count unless mold filaments were present in more than 66% of the microscopic fields.

Since this announcement was made, great improvements have been effected by the industry in the control of its factory operations. In the light of these advances the limit of 66% mold count is now unjustifiably liberal. Beginning with the coming season, proceedings will be recommended against tomato products if mold filaments are present in more than 50% of the microscopic fields.

The plaintiffs introduced also six affidavits, having copies of invoices attached, which were admitted in evidence and marked collective exhibits A, B, C, D, E, and F, respectively. These affidavits were executed in Italy by persons connected with the following Italian packers: Del Gaizo-Santarsiero; Gabriele Gambardella & Figli; Societe Generale delle Conserve Alimentari Cirio; Castelli & Co.; F. Vitelli & Figli; and Luigi Vitelli Figlio. Some of these affidavits are written in the Italian language but English translations are attached. These exhibits have been carefully examined and it appears therefrom that all of the affiants agree substantially as to methods of producing canned tomatoes and tomato paste, both for shipment to the United States and for use in Italy; with the statements of Mr. Louis J. Scaramelli reviewed above. The affiants all agree that

Naples is the principal market in Italy for the products and that sales of tomatoes for export in the wholesale trade are made in quantities of 250 cases and upwards and tomato paste in quantities of 100 cases.

The affiants testified to some facts that were not mentioned by Mr. Scaramelli. It appears from their testimony that canned peeled tomatoes and tomato paste sold for home consumption in Italy must be packed in cans made of tin plate made in Italy, under the Italian law, which involves an expense of 3.50 or 4 lire per case more than the cost of the cans used to pack the goods shipped to the United States, those cans being made from tin plate which is imported into Italy under bond, without duty, provided it is exported within 2 years. They testified also that the tomato paste packed for home consumption in Italy is placed in 100-gram and 200-gram tins, and, to a small degree, in 400-gram tins while that shipped to America is packed in 250-gram tins. The affiants admitted, however, that there is a negligible quantity of tomato paste in 250-gram tins sold in Italy. This paste was originally packed for shipment to the United States but the cans are described as "tic-tac or springer cans." Such cans are described in the following statement in collective exhibit C:

Deponent further states that the canned tomatoes sold for Italian home consumption carry no restrictions as to so-called tic-tac cans or springers, which are puffed cans of peeled tomatoes or tomato paste which have been over-filled to an extent where insufficient space has been left for gas expansion after sealing.

The affiants point out also that in one quality of peeled tomatoes shipped to the United States there is a sauce added to the tomatoes in the cans and that such merchandie is not used in Italy. In collective exhibit D, the affiant shows the reason for the difference in taste between the tomato paste manufactured for the United States market and that sold for consumption in Italy. That statement is contained in the following excerpt:

. Deponent further states that the tomato paste manufactured for consumption in the Italian home market is made from the daily run of fresh tomatoes, including the addition thereto of the over-riped tomatoes, as well as the peels from the manufacture of peeled tomatoes; that tomato paste so manufactured results in a product with a higher percentage of bacterial molds, yeast and spores than permitted by the standards of the U. S. Department of Agriculture; that such paste is preferred by the Italian home market trade because although of a higher percentage of fermentation it produces a taste which is relished by the Italian consumers.

The next witness called by the plaintiffs was Mr. Amerigo Vitelli who testified that he had been engaged in packing and selling tomatoes and tomato paste in Italy for 12 years; that he was a member of a firm in Italy and he supervised the packing and had visited other firms engaged in the same business and that the process of selection of tomatoes and the method of packing used by those firms was the same in every plant. He described the methods used in the selection

of the tomatoes and the method of packing used by all of the firms, and it appears from the record that his testimony is substantially the same on this subject as that given by witness Scaramelli above reviewed, so his testimony on that point will not be reviewed in detail in this decision.

The witness testified further that in the sale of canned tomatoes and tomato paste for home consumption in Italy the packers ship the goods to their own warehouses, which he considered wholesale transactions, and the merchandise is sold from the warehouses in lots of from 1 to 10 cases to different parties in Italy, such as retail stores, hotels, boarding houses, colleges, institutions, etc.; that there are some wholesalers in different cities in Italy, other than the warehouses of the packers, to whom the factories sell; that most of the factories are located in the Naples district and they sell their merchandise to wholesalers at f. o. b. factory prices and when the factories bill their goods to their own warehouses they are billed at prices lower than when shipped to the wholesalers.

The witness testified further that there were no exportations from Italy to countries other than the United States during the period of the Ethiopian war, which started on the 18th of November, 1935, and ended in July 1936, because the League of Nations applied sanctions against Italy during that period; that, when weather is unfavorable for the raising of tomatoes, there are more green and cracked tomatoes in the crop but the only result of the character of the crop in such years is that the quantity of tomatoes packed for the Italian home market is increased; that the quality of the American pack is always the same, no matter how poor the crop, due to the method of selection of the tomatoes for packing for American ship-ments; that the tomatoes packed for American use and for Italian use are two separate commodities and one could not be exchanged for the other in the trade.

The witness testified further that the prices of the Italian pack sold to the retail dealers for home consumption includes the costs of transportation from the factories to the local warehouses and from the warehouses to the domicile of the buyers and includes also the warehouse expenses, insurance, and commission of the agent of from 5 to 8 per centum.

On cross-examination the attention of the witness was directed to an item covering 15 cases of tomato sauce of 100 tins, 500 grams each, on the invoice covered by reappraisement 122960–A and he was asked if that merchandise was sold for home consumption in Italy. The witness answered that paste in the same sized tins was sold for home consumption and that canners pack tomato paste in that size tins for home consumption in Italy; that the firm of Luigi Vitelli & Figlio with which he was formerly connected is owned and

operated by his three brothers and he purchased his goods from that firm and also sold their goods to other firms in the United States on commission, but he is not the exclusive agent of that firm; that in 1936 the price of 1,000-gram tins of tomatoes which he sold in this country was $1.95 or $2 per case, cost and freight included, and the price of 1,200-gram tins and 600-gram tins was $2.30 and $2.90 per case, respectively, cost and freight included; that he never bought any of such merchandise at a price in lire; that he received offers from other firms at approximately the same prices he paid but sometimes there was a difference of 10 cents per case, as a rule, lower than the prices he paid; that the merchandise he bought was just the same quality as that offered by other firms; that, if his brothers had shipped to him the produce of some other packer with his label on it, he would have accepted it; that he could tell the difference between his brothers' produce and that of other firms by the number of rings on the top of the cans; that he was in Italy in 1936 and saw the merchandise packed that year; that he was not there in 1935 and his testimony as to the method of packing refers to years other than 1935, but in all years the method of packing was the same; that for exportation to countries other than the United States the packers are not so careful in selection of the fruit but there were no exportations to other countries in 1936 up to the time he left there which was at the end of August, but he could not testify whether or not there were exportations to other countries after he left; that about 35 to 40 per centum of the run of the crop of tomatoes is used for the packing of merchandise for the United States but when they are packing for home consumption about 75 to 80 per centum of the run of the crop is used and when they are packing for countries other than the United States they use about 65 to 70 per centum of the run of the crop; that there were no exportations of the 1935 pack to countries other than the United States; that tomato paste shipped to countries other than the United States is produced in the same manner, more or less, as that for home consumption unless specified differently; that tomato paste packed for shipment to the United States is low in molds, bacteria, and spores while that packed for home consumption in Italy is high in molds, bacteria, and spores; that the price of making paste for home consumption is different from that for exportation to the United States, both the material and the process being different; that packers in Italy sell for home consumption to jobbers in wholesale quantities and the jobbers sell to other customers, such as retail stores and restaurants; that hundreds of cases are shipped to the warehouses; that there is a consuming market in Palermo where warehouses are located, also in Genoa, Bari, and Naples, but there are no factories in Genoa, Bari, or Palermo; that the principal market is Naples.

The witness was asked if the wholesale prices in Italy were the same at Palermo, Bari, and Genoa and he replied as follows:

The prices could not be the same because the wholesale market is in Naples. When somebody from Genoa, buys in wholesale quantities, tomatoes, he buys them F. O. B. factory, and Naples is the main wholesale market. The buyer goes to Naples District and buys the merchandise and takes it away to wherever he wants, and then the transportation charges are different, according to the distance of the places.

The witness testified further that Genoa, Bari, and Palermo "should not be considered as wholesale markets because the wholesalers go to Naples to buy"; that he knew there is a north Italian market for peeled tomatoes in the city of Pienza but there is no market in Trieste; that for home consumption in Italy there is no requirement as to peels, molds, colors, or solidity, but there is a requirement as to the cans which is that the cans shall not be rusty or swelled but there is also such a requirement in the United States; that the United States requirements are different from those in the home market for consumption in Italy; that there are regulations in Italy as to the different types of paste; that if the paste is below 22 per centum solids it is called an extract.

At the close of the plaintiffs' testimony, counsel for the defendant moved to dismiss the appeals on the ground that the plaintiffs had failed to establish the lack of a foreign market for such or similar peeled tomatoes and tomato paste and that they had failed to prove that peeled tomatoes and tomato paste such or similar to that sold to the United States in 1936 were sold for home consumption in Italy at a value less than the export value, or the claimed export value. This motion was taken under advisement by the court with the statement that exception would be granted to the losing side. The motion is denied.

Counsel for the defendant then offered forty-two reports of Government agents which were marked exhibits 19 to 61, for identification. Counsel for the plaintiffs made detailed objections to all of these reports except numbers 31, 37, and 58, for identification. Those three reports were admitted in evidence and marked exhibits 31, 37, and 58, respectively.

Objection was made to the receipt of the exhibits marked "19 to 30, for identification" on the ground that it appears therefrom that the investigation was made by customs clerk Nicholas Paterniti who did not sign the same, citing article 1381 (c) of the Customs Regulations of 1931.

With respect to the other reports marked for identification (not including exhibits 31, 37, and 58 which were admitted at the trial), the plaintiffs' objection was based principally on the fact that Treasury representative Thomas Bernard Connor, who made the investigations and signed the reports, was, at the time of the trial, in New York and therefore available to testify before the court.

After making specific objections to each of the reports, counsel for the plaintiffs made the following general objections to all of them:

That none of these special agents' reports offered in evidence mention the wholesaler or wholesale market conditions or the fact that they have investigated whether or not any wholesale market conditions existed in Italy, either for home consumption or for export. Nor do they give the names or location of any wholesale dealers. Second, that none of them state the degree or percentage of concentration of the paste sold in Italy. Third, that in none of the cases is there evidence that the Special Agent asked the Italian Packer, whether the so called home consumption pack would or would not pass United States inspection.

I have examined all of the reports in exhibits 32 to 61, for identification, and find that all except exhibits 36, 39, and 44, for identification, bear the name of Mr. Connor either in handwriting or in print. Exhibits 36 and 44, for identification, are signed by Treasury representative William A. Conkright and also by either supervising Treasury attaché Bernard Wait or acting supervising Treasury attaché Joseph A. Fortier. Exhibit 39 contains the typewritten signature of supervising Treasury attaché Bernard Wait but, like exhibits 19 to 30, for identification, the investigation seems to have been made by customs clerk Nicholas Paterniti. Obviously the objection to the three exhibits on the ground that Mr. Connor was available to testify in court does not apply to those exhibits.

Counsel for the defendant announced that Mr. Thomas Bernard Connor had been located and he was called to the witness stand by the defendant. He testified that at the request of the Treasury Department he went abroad as a Treasury representative in 1937 and made certain investigations regarding peeled tomatoes and tomato paste and reports of such investigations were filed.

The attention of the witness was directed to collective exhibits 32 to 61, for identification, excepting exhibits 37 and 58, and he testified that those were his reports of the investigations.

Counsel for the plaintiffs then renewed his objections to the receipt of the reports on the ground that they were secondary evidence and that the facts found by the Treasury representative were susceptible of ascertaining from questions and answers put to the witness on the stand. The court at that time sustained the objection but, after further testimony was introduced, the court revised the ruling and took the objections under advisement.

The witness was shown exhibit 32, for identification, and he testified that his signature appears thereon; that it is a report made by him concerning peeled tomatoes and tomato sauce investigated at the firm of Antonio Petti Fu Pasquale, at Nocera Superiore, Italy; that he visited the firm in the ordinary course of business and, to the best of his recollection and belief, the report is true and correct but he did not recall the details of his investigation or the facts stated in the report. The witness looked at his report, and then testified that the

firm was a small dealer and did not ship merchandise directly to the United States; that he was told that the firm kept no records; that he called at Dionisio D'Auria and showed Mr. D'Auria consular invoice No. 1836, dated at Naples, August 29, 1936, and was told that he purchased the goods from Petti and shipped it to the United States.

The witness testified further that he investigated between thirty-eight and forty manufacturers of tomatoes in tins and tomato paste but he did not recall what he ascertained in his investigations nor the contents of his reports; that he made his reports the same evening of the day he made the investigation; that he would visit the manufacturer, inspect his books and records and take information from the records pertaining to the investigation; that he made his notes in shorthand and transcribed his notes on the typewriter and immediately wrote his report and sent it to the office of the supervising Treasury attaché in Paris where it was typed in final form and sent back to him for signature and he would sign it and mail it back to the Treasury attaché who would transmit it to the United States; that exhibit 32, for identification, represents the facts ascertained in his investigation at the time of making the report and he believed it to be a true and correct report of the facts ascertained. On cross-examination the witness testified that there might be a few changes in verbiage made by the Paris office in the reports.

Counsel for the plaintiffs made further objection to exhibit 32, for identification, on the ground that it was not the original notes made by the witness but was a revision of the original notes, and, furthermore, that it is not admissible as a record of the man's past recollection.

Counsel then stipulated that, as to all of the other reports marked for identification, except number 36 which was not signed by Mr. Connor, if the same questions were asked the witness he would testify that he did not remember the details of his investigations and that the same objections made in respect to exhibit 32, for identification, would be considered as made with respect to the other exhibits.

The witness was then interrogated with respect to a report of an investigation made at the manufacturing plant of Industria Salernitana Conserve Alimentari of Salerno, Italy. He testified that he had read the report but he had no independent recollection of the investigation; that his report represents the facts ascertained in the investigation. The report was offered in evidence. Counsel for the plaintiffs called attention to a statement in the report concerning samples of merchandise sent to the Customs Information Exchange in New York and asked the witness if he sent the samples, packed the samples, or received the samples directly from the manufacturer, to which the witness replied that he did not. Counsel for the plaintiffs then made the same objection to the report previously made in regard

to the other reports bearing Mr. Connor's signature, decision on the objection being reserved. The report was marked exhibit 62, for identification.

On cross-examination, the witness was asked if he visited any wholesaler in Italy, that is one who bought and sold in the Italian market, and he stated that he had not. He testified further that he did not see the operation of packing peeled tomatoes and tomato paste; that he did not investigate the materials or the process of packing tomatoes; that he speaks the Italian language and the translation of the word "Stessa" means similar; that he used the word "similar" in his reports as a translation of the Italian word "Stessa"; that he did not know whether the packers with whom he conversed knew when he used the Italian word what the legal meaning of "such" and "similar" was in the United States. The witness was asked to explain the meaning of the words "such" and "similar" as he knew it and he said: " 'such' to me means actually alike, 'Similar' means closely resembling."

The next witness called by the defendant was Mr. William Konin who testified that in 1936 and 1937 he was clerk for examiner Knapp and worked under his supervision; that he saw the reports and the samples which came to examiner Knapp; that he worked in connection with the reports but he had nothing to do with the samples; that the report marked exhibit 62, for identification, was in the continuous custody of the examiner's office; that he had seen a package containing samples marked "number 102/425" which was kept in a sample closet in the examiner's room; that "we had the containers and covering and the empty tins after they were analyzed."; that he did not recall seeing Mr. Knapp unwrap the package. The witness produced certain containers and the wrapper in which they arrived and counsel for the defendant offered the same in evidence, but, upon objection by counsel for the plaintiffs, they were not received by the trial court. The containers and wrapper were marked exhibits 62–A and 62–B, for identification. Counsel for the defendant offered also two reports of analyses with papers attached. Objection thereto made by counsel for the plaintiffs was sustained and the papers were marked collective exhibit 62–C, for identification.

The defendant then offered in evidence a report by Treasury attaché Bernard Wait, dated October 3, 1938, in which reference is made to samples obtained by customs clerk Nicholas Paterniti from four different firms and delivered to the chief purser of the S. S. *Excambion*. Certain empty tin cans were also offered with the report. On objection by counsel for the plaintiffs, the report was marked collective exhibit 63, for identification, and the cans were marked collective exhibit 63–A, for identification, collective exhibit 63–B, for identification, collective exhibit 63–C, for identification, and collective

exhibit 63–D, for identification. Decision as to the admissibility of the exhibits was reserved by the court.

The defendant offered in evidence a copy of a letter by J. Eardley, deputy appraiser, directed to the Department of Agriculture, purporting to submit certain samples received with Paris report 102/26, with a request to have the samples analyzed. Counsel for the plaintiffs objected to this exhibit on the ground that the contents are immaterial, incompetent, and irrelevant. Decision as to its admissibility was reserved and the letter was marked exhibit 63–E, for identification.

Counsel for the defendant then offered in evidence a report of the United States Department of Agriculture, consisting of five pages, dated December 3, 1938, addressed to the appraiser and referring to the appraiser's letter dated December 2, 1938. Counsel for the plaintiffs objected to the admission of these papers on the ground that they are immaterial because they refer to some analyses of the contents of certain tins not identified with anything in the record. The court reserved decision as to the admissibility of the papers and they were marked collective exhibit 63–F, for identification.

An inspection of the reports marked exhibits 19 to 30, for identification, to which counsel for the plaintiffs objected on the ground that it appears therefrom that an investigation was made by customs clerk Nicholas Paterniti and he did not sign the same, shows that some of them are signed by Treasury representative J. Homer Butler and others by Treasury attaché Bernard Wait. Mr. Paterniti's signature does not appear on any of them. Counsel for the plaintiffs claims that the reports are invalid because they do not comply with the provisions of article 1381 (c) of the Customs Regulations of 1931, reading as follows:

(c) Each report of investigation shall be signed by the agent or agents making the investigation. It shall be approved by the agent or representative in charge of the office, before being forwarded to its destination. Routine correspondence shall be signed only by the agent in charge, except in special cases, when it may be more advantageous to have some other agent sign.

Counsel for the plaintiffs argues in his brief that

Since these purported reports were not signed by the agent making the investigation they are not official reports such as are entitled to admission under the provisions of Section 501.

Counsel for the defendant in his brief, after quoting article 1396 (d) of the Customs Regulations of 1937 which appears to be the same as article 1381 (c) of the Customs Regulations of 1931 in force at the time of these importations, states:

The foregoing provision seems to be contained within the provision for the duties of customs agents who are required to make investigations and reports in connection with the prevention and detection of frauds of the customs revenue.

If that provision is read in connection with the other subdivisions of the same article of the Customs Regulations it will be observed that it refers to an investigation in the United States and does not relate to investigations or reports made in foreign countries. Hence, the objection that the reports were not made by Customs Clerk Paterniti, or that they were made by Butler and Wait, is untenable as the said article of the Customs Regulations does not refer to the kind or type of investigations or reports involved herein.

An examination of the entire instruction in article 1381 seems to bear out the theory advanced by counsel for the defendant that the provision relates to the duties of customs agents in the United States. Article 1385 of the Customs Regulations of 1931 refers to investigations abroad and there is nothing therein to indicate a requirement that the person making the investigations shall sign the reports. That section, as amended on January 9, 1933, T. D. 46236, reads:

Article 1385 of the Customs Regulations of 1931 is hereby amended to read as follows:

Art. 1385. Investigations abroad.—(a) Customs officers desiring investigations in foreign countries (other than Canada, Mexico, Cuba, and the British West Indies) shall submit their requests for such investigations to the Customs Information Exchange, 201 Varick Street, New York, N. Y.

(b) Investigations in foreign countries (other than Canada, Mexico, Cuba, and the British West Indies) shall be made under the supervision of Treasury attachés, accredited to such countries, or, if there be no Treasury attaché in a country, by representatives of the State Department.

(c) Investigations in Canada, Mexico, Cuba, and the British West Indies shall be conducted by the supervising customs agents in charge of districts nearest to the territory in which such investigations are made. Customs officers desiring such investigations shall submit the request to the proper supervising customs agent. A copy of each such request shall be forwarded to the Customs Information Exchange and a copy shall also be sent to the Commissioner of Customs (investigating unit). If the desired information is available in New York, the supervising customs agent of the Customs Information Exchange shall immediately forward it to the officer submitting the request, sending a copy of his communication to the supervising customs agent upon whom the request was made and a copy to the Commissioner of Customs (investigating unit).

The portion of section 501 of the Tariff Act of 1930 relating to the consideration by the court of affidavits and reports of various officers of the Government reads as follows:

\* \* \*. In finding such value affidavits and depositions of persons whose attendance can not reasonably be had, price lists and catalogues, reports or depositions of consuls, customs agents, collectors, appraisers, assistant appraisers, examiners, and other officers of the Government may be admitted in evidence. Copies of official documents, when certified by an official duly authorized by the Secretary of the Treasury, may be admitted in evidence with the same force and effect as original documents.

These exhibits are all photostatic copies of reports either by Treasury representative J. Homer Butler or Treasury attaché Bernard Wait and they all appear to be certified by C. B. Webb of the Customs Information Exchange to the effect that they have been compared with the originals on file and are true and correct copies thereof. Counsel for the plaintiffs make no contention that Mr. Webb was not authorized to certify the same.

In my opinion there is nothing in the language of section 501, *supra*, which indicates that the court cannot consider a report of a Government representative who is abroad, or a copy of such report, which is not signed by the person who made the investigation. The objections to exhibits 19 to 30, for identification, are overruled, with exception granted to counsel for the plaintiffs, and the documents are admitted in evidence as exhibits 19 to 30, respectively. The same ruling applies to exhibit 39, for identification, which appears to have been originally signed in a like manner and that exhibit is admitted in evidence as exhibit 39, with exception granted counsel for the plaintiffs.

An objection was made to the receipt of exhibits 36 and 44, for identification, on the grounds that they are not dated and the subject matter of the reports is immaterial and that as to exhibit 36, for identification, "no identity of similarity or dissimilarity of the export or home consumption article is shown" and, as to exhibit 44, for identification, "all sales listed therein are after the date of the test case." ' These two reports, as some of the other reports, bear dates which appear to have been inserted by a rubber stamp but the dates when the investigations were made appear in the body of the reports. The other objections relate merely to the weight to be placed on the statements in the exhibits. The objections are overruled with exception granted counsel for the plaintiffs, and the exhibits will be marked exhibits 36 and 44, respectively.

On all of the other exhibits in the lot which were marked exhibits 32 to 62, for identification, that is, on all of those which were signed by Mr. Thomas B. Connor, counsel for the defendant claims that the presence of Mr. Connor in court is not a sufficient ground for rejecting the reports, and, if they should be rejected on that ground, they are still admissible because Mr. Connor testified that he once knew all the facts and made memoranda of them at the time or soon after he made his investigations but that he had forgotten the facts and was unable to testify to the facts after examining the reports which he signed, citing *Howard* v. *McDonough*, 77 N. Y. 592, 593; *McCarthy* v. *Meaney*, 183 N. Y. 190; *Russell* v. *Hudson River R. R. Co.*, 17 N. Y. 134; *National Ulster County Bank* v. *Madden*, 114 N. Y. 280, 21 N. E. 408, 11 Am. St. Rep. 633; *People* v. *McLaughlin*, 150 N. Y. 365, 392, 44 N. E. 1017; *Mattison* v. *Mattison*, 203 N. Y. 79, 96 N. E. 359; *People* v. *Weinberger*, 239 N. Y. 307, 146 N. E. 434; *T. D. Downing & Co. et al.* v. *United States*, 16 Ct. Cust. Appls. 293, T. D. 42873.

Counsel for the plaintiffs, in his brief, argues that "A mere reading of Section 501 makes clear that the exception to the ordinary rules of evidence there granted to both parties is based upon the theory that the attendance of a witness having the necessary first-hand knowledge can not reasonably be had." Counsel argues also that the reports are not admissible under the hearsay rule known as "past recollection

recorded" because they are not the original memoranda made shortly after the events therein described but were derived from reports made by the witness and thereafter transmitted to the Paris office where they were rewritten and revised, citing *In re Messinger et al.*, No. 20777, 32 Fed. Supp. 490, and Richardson on Evidence, wherein the case of *Russell* v. *Hudson River R. R. Co.*, 17 N. Y. 134, was cited.

In the case of *Cabrera Bros.* v. *United States*, Reap. Cir. 34932, Division Three of this court, then known as the Board of United States General Appraisers, passed upon a case wherein the trial judge rejected a report of a special agent who was present in the courtroom at the time of trial. In considering an assignment of error relating to that rejection of the exhibit, Judge Adamson, speaking for the court, said:

\* \* \*. It was error to exclude the special agent's report, the admissibility of such report not depending on the personal location of the maker thereof, who may be sitting in the courthouse and hearing his report read. That was not reversible error, however, because the special agent was on the stand when his report was excluded. Government counsel could have proved by him everything in the report, if he so desired, but instead of so doing he excepted to the ruling and withdrew the witness. Furthermore, an examination of the report itself, as well as the testimony of the other official, as to the contents thereof, discloses their insufficiency to cause a reversal of the decision of the single General Appraiser.

On appeal from that decision, one of the assignment of errors being "In not reversing the rulings upon evidence made by the single General Appraiser," the appellant argued that it was the duty of the single judge to receive the report (exhibit A) in evidence. The above facts are shown in the decision, *United States* v. *Cabrera Bros.*, 13 Ct. Cust. Appls. 82, T. D. 40936. The court refused to pass on the point, however, saying:

The argument of the Government in this court reduces to three contentions:

(1) That under said section 501 it was the duty of the single general appraiser to receive in evidence Exhibit A.

(2) That there was error in excluding the report of Collector Watson. •

(3) That the Board of General Appraisers has made no findings of fact in accordance with the statute.

As to the first, it may be said that the Government has, apparently, studiously refrained from making that exhibit a part of the record in this case, so that we are without authority to examine it. The quoted statute provides that such reports "may be considered." The Government urges this provision is mandatory upon the single general appraiser and, therefore, that he committed reversible error in refusing to receive the exhibit in evidence, for which reason the board should have reversed his judgment and remanded the case to him for further proceedings.

It is at once evident that we can not pass upon the admissibility of the offered exhibit without an opportunity to examine the same, in order to determine whether or not its contents are material and relevant to any issue involved, because, manifestly, the statute does not contemplate that such reports are admissible unless they are relevant to the issue.

The fact that the investigations in Cuba, upon which Exhibit A was based, were made several months after the entries here, emphasizes the importance of having the report before us before we pass upon the question of its admissibility.

It is manifest that the appellate court did not consider the presence of the special agent in court a ground for rejecting his report as evidence, it appearing that the court considered that the only valid ground for rejecting that report was the materiality of it after it was considered and that the reason for refusing to pass on the rejection of the report by the trial judge was based on the fact that it was not available for examination by the appellate court. The third division of the Board of United States General Appraisers considered the report even though the trial judge had rejected it on the ground that the author of the report was present in court, and said that it was error to reject it because the special agent was available for examination in court.

The only other case on this subject brought to my attention is *United States v. H. Meyer*, 5 Cust. Ct. 630, Reap. Dec. 5066, from which it appears that the special agent who made the report was located in New York where the trial occurred. The trial judge admitted the report and the appellate division considered it although it criticized the admission of it. The court said:

At the first hearing the plaintiff offered and there was received in evidence a special agent's report dated New York, N. Y., December 12, 1939. Since the *instant merchandise was imported and entered at the port of New York and the special agent's report was made by a special agent at the port of New York no* reason appears why this special agent, who was so well informed as to the value of this merchandise, should not have been called as a witness for the Government to testify, when he would have been subject to cross-examination, rather than furnish this court secondary hearsay evidence in the form of the report now before us. There is no evidence, or even a statement, to the effect that the attendance of this special agent could not reasonably be had.

However, be that as it may, the information contained in said report is wholly insufficient to overcome the presumption of correctness in favor of the appraiser's action.

Counsel for the defendant read into the record statements made by Judge Dallinger of this court in reappraisement 131677–A wherein the trial judge admitted certain reports of special agents made by a special agent at the port where the trial took place. However, the quoted language does not appear in the decision of the case, *Union Brokerage Co. v. United States*, 6 Cust. Ct. 854, Reap. Dec. 5180.

A reading of section 501, *supra*, indicates that Congress intended that affidavits and depositions of persons whose attendance cannot reasonably be had may be admitted in evidence in reappraisement cases and also that "price lists and catalogues, reports or depositions of consuls, customs agents, collectors, appraisers, assistant appraisers, examiners and other officers of the Government" may be admitted. It does not appear that the words "whose attendance can not reasonable be had" relate to any of the documents mentioned except the affidavits and depositions in the opening phrase of the provision. I hold that the reports signed by Treasury representative Thomas B. Connor above referred to are admissible and direct that they be

marked in evidence in the case, exception being granted to counsel for the plaintiffs.

There remains for consideration the admissibility of exhibits 63, 63–A, 63–B, 63–C, 63–D, 63–E, and 63–F, for identification. Exhibit 63, for identification, appears to be a routine letter, dated at Paris, October 3, 1938, written by Supervising Treasury attaché Bernard Wait in answer to a letter from the Bureau of Customs dated August 19, 1938. The only facts contained therein are that customs clerk Nicholas Paterniti obtained samples of tomatoes and tomato sauce from four firms named at the head of the letter and delivered them to the chief purser of the S. S. *Excambion* "which will be at the port of New York from October 13th to October 25th." The letter contains also a suggestion that an agent from the appraiser's office be delegated to withdraw the samples from the purser. There is nothing in the letter which indicates how the samples were obtained or whether they are the same or similar to the 1936 exportations from Italy which are covered by these cases. The letter is dated more than 2 years subsequent to the last exportation herein involved. The admissibility of exhibits 63–A, 63–B, 63–C, 63–D, 63–E, and 63–F, for identification, hinges on the admissibility of exhibit 63, for identification. Under the ruling in *United States* v. *Cabrera Bros.*, *supra*, it is the duty of the court to determine if such documents are admissible by an examination of the same. I find that there is nothing in this letter to connect the samples referred to with the importations in this case and hold that the exhibits marked for identification as above indicated are all immaterial and irrelevant to the issue herein involved. The objections to the admission of the exhibits are sustained, with exception granted to counsel for the defendant.

In all of the forty-three exhibits, numbers 19 to 62, the customs agents reported that the importers paid and the shipper collected the amounts shown on the consular invoices under investigation. Only eleven of the exhibits (numbers 25, 26, 27, 29, 30, 36, 38, 42, 48, 50, and 52) relate to investigations made at the plants of the manufacturers of the goods herein involved. Exhibits 25, 27, 29, 30, 36, and 42, however, cover investigations of consular invoices other than those involved in this case. In exhibit 26, the customs agent called attention to a clerical error on invoice No. 692, covered by reappraisement 129995–A, in failing to mention discounts. The following appears in the report:

The declared unit prices were found in accord with the firm's records. However, discounts of 1% on tomato sauce and 2% on the peeled tomatoes (swell discounts) were allowed and were not declared on the consular invoice, due to a clerical error.

In the majority of the exhibits (numbers 19 to 62), the customs agents reported that they were informed that the quality of peeled

tomatoes and tomato sauce sold in Italy is the same as that sold to the United States. There are some instances, however, where it is reported that the quality of goods shipped to the United States was not sold in Italy. In exhibit 22, the customs agent reported that in his investigation at the firm of Giacomo Rinaldi of Sanserverino Rita, Italy, he was informed that sales of inferior products were made in Italy. After reporting certain sales in Italy, the customs agent states:

Mr. Rinaldi pointed out that the sales in question were not indicative of market prices of the merchandise shipped, as the merchandise had been produced with the tomatoes discarded from lots handled in the factory for the sauce and tomatoes produced for shipment to Rinaldi Bros., which, as stated, is the sole object of his factory's activities.

In exhibit 50, the customs agent, after making an investigation at the firm Societa Generale delle Conserve Alimentari "Cirio," at Naples, reports:

Upon my first visit to Cirio, Mr. Signorini stated that the quality of peeled tomatoes sold in Italy was the same as that exported to the United States. Upon a return visit he amended this statement by saying that it was different, but that exporters had always stated it was the same as a matter of pride not wishing to admit that they sold a product in Italy that was inferior to that offered to the United States.

Essential differences are that for export not more than one inch of skin may be used, whereas in Italy there is no restriction. Mr. Signorini further contended that peeled tomatoes and sauce sold in Italy would not be accepted in the United States.

In exhibits 51 and 62, the customs agent, in reporting on an investigation made at the firm of Industria Salernitana Conserve Alimentari, of Salerno, Italy, states:

There is very little demand in Italy for peeled tomatoes and sales by this company are mostly of the tomato sauce. Size of cans of peeled tomatoes sold in Italy is the same as that for the United States.

Mr. Domenico informed me that the sauce sold in Italy was inferior in quality to that sold to the United States as United States requirements were far more severe than for Italy, only choice tomatoes being used.

In exhibits 46 and 54, the customs agent reported that the firms under investigation made a concentrated extract of tomato paste for sale in Italy which was not sold to the United States.

In a number of the exhibits the customs agent reports sales of peeled tomatoes in puree to the United States and it appears that that particular product is not sold in Italy.

In exhibits 31, 53, 55, 57, 58, and 59, the customs agent reports that the firms covered by those investigations do not sell in the Italian market for home consumption, their only sales being to the United States.

In exhibits 23, 24, and 26, it is reported that defective cans of tomatoes or tomato paste are not exported but are sold in the home market in Italy.

In each one of the exhibits it is reported that the cost of the cans on the peeled tomatoes and tomato paste sold in Italy is higher than those sold to the United States, due to the Italian duty on tin which is used to make the cans. It is stated that the duty on the tin is refunded upon exportation of the cans within 2 years after the tin is imported.

In most of the reports the customs agents stated that they investigated compensatory premiums which appear to refer to a profit which the Italian shippers may make on the sale of United States dollars received in payment for the merchandise. Some of the manufacturers acknowledge receiving a profit amounting to from 18 to 20 per centum, but most of them stated that no such profit was received.

The plaintiffs offered the testimony of four witnesses in rebuttal,— Mr. Louis J. Scaramelli, Mr. Amerigo Vitelli, and Mr. Frank Mastronandi, who testified in the plaintiffs' primary case, and Mr. Domenico D'Angiola, who is an agent of Italian manufacturers. All of these witnesses, except Mr. Mastronandi, testified that they were in Italy during the packing season of 1935 or 1936 and visited many of the plants which the customs agent reported were selling in Italy the same merchandise shipped to the United States. The witnesses stated that they watched the process of packing in those plants and found that there was a different method used for the products sold to the two different countries—United States and Italy. They stated that the merchandise packed for the United States market was made from selected ripe tomatoes while that packed for use in Italy was made from the run of the crop and including the peelings from the tomatoes when the paste was being manufactured; that no peelings were used in making paste for shipment to the United States. Mr. Mastronandi testified that he was in Italy in 1936 after the canning season closed but he opened the products of that season in different factories and could distinguish the difference between the merchandise packed for the United States and that packed for Italy. On cross-examination, some of the witnesses testified that some of the persons interviewed by the customs agent were poorly educated and might not have known the meaning of the words "such" or "similar" used by the customs agent.

The weight of evidence indicates that in packing peeled tomatoes and tomato paste or sauce for the American market, the packers use only selected tomatoes which are sound and ripe, which is one of the requirements necessary in order to make the products come within the specifications of the United States Department of Agriculture relating to the amount of skin or peel in the tins and the amount of mold or bacteria in the products. On the other hand, the peeled tomatoes and tomato paste or sauce packed for the Italian market are made from the run of the crop of tomatoes, consisting of sound

tomatoes and also green, light-colored, and sunburned tomatoes, and tomatoes discarded in packing peeled tomatoes for the United States market. In the paste or sauce, the peelings from the peeled tomatoes are also used, the product being higher in mold count and bacteria than that shipped to the United States, and the paste for Italian use has a different taste. These facts are supported by the testimony of the three witnesses offered in court by the plaintiffs and by the six affidavits, collective exhibits A to F.

The facts introduced by the defendant indicate that most of the packers told the customs agent that the merchandise sold in Italy was the same or similar to that sold to the United States but this testimony is weakened by the statements of plaintiffs' witnesses on rebuttal to the effect that many of the packers among those visited by the customs agent actually used a different method in preparing products for the two markets. The customs agents reported also that some of the packers showed the difference between the products for the American markets and those for home consumption in Italy.

While the peeled tomatoes and the tomato paste packed for both markets were derived primarily from the same kinds of tomatoes, such fact does not conclusively show that the products for the two markets are similar. In the case of United States v. Kraft Phenix Cheese Corp. et al., 26 C. C. P. A. 224, C. A. D. 21, it was shown that the portion Roquefort cheese sold to the United States and the standard Roquefort cheese sold in France were both derived from the same kind of sheep's milk. The court affirmed the judgment of the trial court holding that the two kinds of cheese were different, due to the methods used in the manufacture thereof and the characteristics of the cheese, and that one was not similar to the other for appraisement purposes.

In the case of United States v. Vietor & Achelis, 17 C. C. P. A. 412, T. D. 43864, the court affirmed the decision of the trial court in finding that black velvet ribbons manufactured in Germany and exported to the United States were not similar to black velvet ribbons sold for consumption in Germany because the imported ribbons had either silk or cotton edges while those sold for consumption in Germany had artificial silk edges.

In Vita Food Products, Inc. v. United States, 69 Treas. Dec. 1367, Reap. Dec. 3790, the court found that sprats in cans packed from the run of the catch were different from sprats in cans packed from selected fish and that one was not similar to the other.

In United States v. Collin & Gissel, 4 Cust. Ct. 622, Reap. Dec. 4723, the court found that barrel washing machines sold in Germany were not similar for appraisement purposes to those shipped to the United States because the two types were of different construction. The judgment in that case was reversed on appeal but

not on the point of similarity. *United States* v. *Collin & Gissel (Ludwig Baer)*, 29 C. C. P. A. 96, C. A. D. 176.

On the other hand, in *Scharf Bros. Co. (Inc.)* v. *United States*, 16 Ct. Cust. Appls. 347, T. D. 43089, the court found that there was evidence to support a finding of the trial court that rock candy sold in Holland was similar to that sold to the United States, it appearing that both were made in the same kind of vats, by the same process, and out of the same material, being approximately of the same value, identical in composition, taste, color, and use, differing only in the sizes of the crystals and in the fact that for the home market the crystals are separated and the strings broken before sale.

In *R. Mohr & Sons et al.* v. *United States*, 16 Ct. Cust. Appls. 448, T. D. 43198, the court found that there was evidence to sustain the finding of the trial court to the effect that so-called second quality binoculars were similar to those of the first quality for purposes of appraisement.

Similarity is a question of fact and when the appellate court has found substantial evidence to support a finding of similarity or dissimilarity by the trial court, it appears that the decision below on that point has been affirmed. But similarity depends on the record in each particular case.

I find that the weight of evidence supports the claim of the plaintiffs that the peeled tomatoes and tomato paste or sauce herein involved are not sold in Italy in the ordinary course of trade and are not similar to products of the same name freely offered for sale in Italy and I hold that there is no foreign value for the imported products involved in this case. While the record shows that there was sold in Italy a small amount of such products in defective cans called "tictac" cans or "springers," which cans were rejected from exportations packed for shipment to the United States, I am of opinion that the sale of such rejected cans of merchandise in Italy does not create a foreign value for perfect goods. At any rate, there is no showing that they were sold in Italy at prices higher than the export values of the imported commodities.

The record shows also that there is one class of peeled tomatoes packed in sauce or puree sold to the United States, but not sold in Italy. Counsel for the defendant asserts that this particular quality is not the subject of this suit.

There are many statements in the record concerning compensatory premiums as a reason for the advance of the appraiser in this case. That subject was passed upon by the court in the case of *Ernesto Solari et al.* v. *United States*, Reap. Dec. 4943, and it was held that so-called compensatory premiums, which relate to profits which Italian exporters may make in the sale of United States currency received in payment of products, do not affect the value of the goods, as appraise-

ment should be based on the value at which merchandise was freely offered for sale. The defendant asserts that compensatory premiums are not involved in this case, and, as the notices of advance attached to the invoices show that the merchandise in this case was advanced from 41 to 53 per centum and the record shows that some shippers obtained from 18 to 20 per centum profit from the sale of United States currency, I am of opinion that, with the exception of the three items stipulated, the question of compensatory premiums is not involved herein.

The next question for decision is whether or not the plaintiffs have established an export value for the merchandise. An examination of the record shows that a large number of contracts and invoices covering the sales of the instant and other shipments were introduced in evidence in exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 18, A, B, C, D, and F. I have examined these contracts and invoices and it appears that the sales prices fluctuated during the period covered by these shipments. Furthermore, some of the prices on the invoices are based on c. i. f. prices which included a charge for ocean freight to New York, Boston, or other ports while others are f. o. b. Naples prices. The witnesses introduced by the plaintiffs testified that they received offers almost daily by agents of Italian packers at the same prices which are shown on the invoices.

The courts have held that invoices have evidential value and are competent evidence. *Lloyd Co.* v. *United States,* 9 Ct. Cust. Appls. 280, T. D. 38217; *United States* v. *Bloomingdale Bros. & Co.,* 10 Ct. Cust. Appls. 149, T. D. 38400; *United States* v. *Sabin,* 12 Ct. Cust. Appls. 520, T. D. 40731; *Sears, Roebuck & Co. et al.* v. *United States,* 30 C. C. P. A. 10, C. A. D. 207.

An examination of the values on the various invoices and contracts in the above-mentioned exhibits at dates approximately the same as the dates of exportation of the different shipments herein involved shows that the entered values in this case are the same prices at which the merchandise was sold for exportation, or offered for sale on the same, or approximately the same, dates of exportation, with two exceptions: (1) The invoices do not show any sales at $8.35 per case of tomato paste in 500-gram tins such as is covered in case P. 21 on the invoice in reappraisement 122960–A. The price shown in the exhibits for that merchandise is $8.75 per case, including ocean freight, insurance, railroad freight, and loading and unloading charges; (2) Tomato paste in 250-gram tins, covered by reappraisement 129833–A, was entered at $4 per case, less 2 per centum, less loading charges. The invoices in the exhibits show a price of $4.25 per case, including certain nondutiable charges.

As to the two items in reappraisements 122960–A and 129833–A, above described, I find the export values of the paste are $8.75 and

$4.25 per case, respectively, less nondutiable charges and less 2 per centum discount.

I find that Naples is the principal market in Italy for exportation of peeled tomatoes and tomato paste and that the usual wholesale quantity in the ordinary course of trade in which such merchandise is freely offered for sale for exportation to the United States is 250 cases of peeled tomatoes and 100 cases of tomato paste or sauce.

I hold that export value is the proper basis for appraisement and that such values of the following items in reappraisement 122690–A are the importer's claimed values:

| Case No. | |
| --- | --- |
| Elvea | 300 Cardboard Boxes Peeled Tomatoes, each 24 tins of 1,200 gr. |
| L. V. C | 500 Cardboard Boxes Peeled Tomatoes, each 48 tins of 600 gr. |
| L. S. C | 200 Cardboard Boxes Peeled Tomatoes, each 60 tins of 300 gr. |

That such value of the merchandise in case P. 21, covered by reappraisement 122960–A, consisting of tomato sauce in 500-gram tins, is $8.75 per case, packed, less ocean freight and other nondutiable charges noted on the invoice and less 2 per centum; that such value of the merchandise covered by reappraisement 129833–A, consisting of tomato paste in 250-gram tins is $4.25 per case, packed, less nondutiable charges noted on the invoice and less 2 per centum; and that such values of all the other items in the various appeals are the entered values. Judgment will be entered accordingly.