(A. R. D. 30)

KOBE IMPORT CO. *v.* UNITED STATES

Entry No. 93460, etc.

## Second Division, Appellate Term

(Decided July 15, 1953)

*Jordan & Klingaman* (*Edward F. Jordan* and *Jacob L. Klingaman* of counsel) for the appellant.

*Warren E. Burger*, Assistant Attorney General (*Chauncey E. Wilowski*, special attorney), for the appellee.

Before LAWRENCE and FORD, Judges

FORD, Judge: This application for a review of the decision and judgment of the trial court, which was reported in 26 Cust. Ct. 676, Reap. Dec. 7997, filed under the provisions of title 28 U. S. C. section 2636 (a), covers appeals listed in schedule A, hereto attached and made a part hereof. The merchandise consists of chatons imported from China and was entered at various unit prices, in most instances at values higher than the invoiced prices. It was appraised at values higher than the entered values on the basis of export value.

Counsel for the respective parties have agreed that the proper basis of appraisement is export value.

The record shows that the appellant herein was a partnership composed of Ralph Josephson and Louis Josephson. Ralph Josephson attended to the import business in New York, while Louis Josephson looked after the business in China, with headquarters at Shanghai, where he had desk space in the office of Eastern Undies Co. The Eastern Undies Co. was operated by C. Y. Chen. Ralph Josephson in New York gave instructions as to what to buy, sent orders for the merchandise he wished to purchase to Louis Josephson, and made available the money with which to purchase the same. Louis Josephson would then advertise for the merchandise, and, when the merchandise was brought in, he purchased whatever he wanted.

Since Louis Josephson did not speak Chinese, C. Y. Chen was employed by him as an interpreter and also as a commissionaire. Chen also inspected, packed, and shipped the goods, for which services he was paid a commission. In some instances, this commission was 3 per centum and in other instances it was 10 per centum. These commissions were paid on the total amount of the invoices. Louis Josephson testified that the involved merchandise consisted of job lots of broken assortments of chatons, as found by the trial court. This testimony was not contradicted in any manner.

There was admitted in evidence as exhibit 8 an affidavit executed by C. Y. Chen, wherein the affiant states:

1. That he speaks and understands the English language, that he is a resident of Shanghai, China, and since October 1st 1940 up to August 18th 1941, has been engaged in business in that city as a buying and shipping agent and also as a manufacturer of silk lingerie, and that he has conducted both business under the name of The Eastern Undies Co.

2. That in his capacity as a buying and shipping agent throughout the aforesaid period including the years 1940 and 1941 up to the outbreak of the war between Japan and the United States he attended to the purchase and shipping of various articles of merchandise including glass lenses, chatons, imitation pearls and cultivated pearls for buyers for export to the United States and elsewhere and for domestic consumption or use in China; and that, as a necessary part of his business, he was familiar throughout the aforesaid period with wholesale market conditions in Shanghai, China, including prices at which the aforesaid kinds of merchandise were being quoted and offered for sale and the range of quantities in which they were ordinarily sold.

\*     \*     \*     \*     \*     \*     \*

7. That the prices at which the said merchandise was purchased were the prices on or about the above-mentioned dates of exportation at which the above-mentioned sellers and others in the Shanghai market were freely offering to sell such and similar merchandise to all purchasers in the usual wholesale quantities and in the ordinary course of trade for export to the United States and for home consumption in China, and that the quantities covered by the above-mentioned purchases were the usual or ordinary wholesale quantities of such or similar merchandise being offered for sale and sold in Shanghai at or about said dates of exportation for export to the United States and for home consumption in China.

With reference to the last paragraph of the above-quoted affidavit, the trial court made the following observation:

The above-quoted portion of Chen's affidavit refers to information which a seller of merchandise might supply from his own knowledge, but a third party, in this transaction an interpreter or buying commissionaire, could make the same statements only by way of hearsay testimony. The record does not contain any corresponding statements by a seller of the merchandise. Even if the sources of this information were fully disclosed, in the light of the stated qualifications of the witness, this affiant's repetition thereof would not be competent.

I therefore find and hold that said Chen is incompetent to give the above-quoted testimony, and the hearsay statements in his affidavit, accordingly, must be disregarded as evidence.

It will be noted that prior to making the statements, which the trial court characterized as hearsay, the said Chen had stated that from October 1, 1940, up to August 18, 1941, he had been engaged in business in Shanghai, China, as a buying and shipping agent, and that as a necessary part of his business he was familiar throughout that period with wholesale market conditions in Shanghai, China, including prices at which the aforesaid kinds of merchandise were being quoted and offered for sale and the range of quantities in which they were ordinarily sold.

It would appear to us that one who had been engaged in business, as was Chen, as a buying and shipping agent, where, as a necessary part of his business, he was required to be familiar with the wholesale market conditions, including the prices at which merchandise was being quoted and offered for sale and the range of quantities in which it was ordinarily sold, would be qualified to give the testimony which the trial court held to be hearsay and, therefore, disregarded it.

However, in view of the conclusion which we have reached, it is not necessary for us to rest our decision upon this point.

For the purpose of showing that the importer actually paid the prices shown on the invoices herein, Louis Josephson was interrogated and answered as follows:

Q. Now, please state whether or not the invoice unit prices on your consular invoice represent the full amount paid to the seller in each case.—A. They do. They represent the amount paid to each seller.

Q. That is the invoice unit prices?—A. Yes, sir.

\* \* \* \* \* \* \*

Q. \* \* \* You mean the dealers from whom you bought these chatons previously bought them from jewelry manufacturers?—A. They bought them back. In some cases they did so. Instead of them selling the chatons, there was no longer any coming in, so they bought them back from them.

\* \* \* \* \* \* \*

Q. Now, what about their condition?—A. They were mostly, in most cases their condition was poor, and they were tarnished, so much so that you could not tell the difference between the molded ones and the machine-cut ones. The machine-cut, which is supposed to be greater and look more beautiful—they looked tarnished, and not even as good as the molded ones, which are cheaper in price, but whatever we bought them for is what we actually paid for them.

\* \* \* \* \* \* \*

Q. Do you mean that the same item might sell for two prices at the same time because of the difference in their condition?—A. Because of the poor condition is the reason we paid less for them.

\* \* \* \* \* \* \*

Q. And you say that the jewelry manufacturers were forbidden to manufacture during that period?—A. They were not forbidden, but they didn't have no electricity to turn over their machinery, and no metal was obtainable. Besides, they couldn't carry it through the streets, because it was like contraband. The police would stop them on the street if they had metal, but chatons, you could transport those without any difficulty or fear.

\* \* \* \* \* \* \*

Q. Mr. Josephson, in buying and selling chatons, please state whether or not the assortment is an important feature, assortment as to size, and so forth.—A. Oh, yes. We bought left-overs. We never got the proper assortment. We never could. It was like beggars could not be choosers. We had to get the left-overs, not order directly from the manufacturer.

Q. Well, in normal trade, must the assortments be balanced as to the quantity in each assortment, in each kind?—A. Yes, they must be balanced. You must have assortment.

Q. Will you just tell us what you mean by "must be balanced."—A. It enhances the value.

Q. No, tell us what you mean when you say "the assortment must be balanced."—A. Yes. For instance, they run in sizes. That commences at 4, 6, 8, 10, 12, 14, 16, 18, and 20. This is the circumference of the face of the chatons. We could not get a good assortment.

Q. What would be a good assortment in those sizes?—A. A good assortment would be an equal amount of each, say 100 packages of each, and more of the desirable numbers, the upper numbers like 12, 14, 16, the most desirable that you would have to have four times as many as you had of the smaller ones.

Q. And that is in normal trade, that is the way they are dealt in?—A. Yes, you buy what you can use.

Q. But now, in the case of these purchases of yours, did you have that balanced assortment you speak of?—A. Never, never. Mostly it seemed to us that we are buying only job lots. We were buying job lots of goods.

Concerning the manner of purchase and the condition of the involved chatons, Ralph Josephson testified as follows:

Q. Mr. Josephson, did you attend to the disposition of these chatons when they arrived in the United States?—A. Yes, sir.

Q. Did you see them all on their arrival?—A. Yes, sir.

Q. Did you examine them?—A. Yes, sir.

Q. In what condition did you find them?—A. I considered them as job lot merchandise, very poor condition generally speaking.

Q. Why? Just what do you mean by "poor condition"?—A. Well, they were tarnished, and some of the tin foil fell off after you examined several papers, and shaking them around you can see the sediment in the corners of the paper which contain about 100 dozen of these stones.

Q. When you said "sediment" what did you mean?—A. The tin foil, little pieces of tin foil.

Q. They were all folded back, were they?—A. That is right.

Q. What about the assortment?—A. The assortment never came in as it would come from the regular source of Czechoslovakia.

Q. You mean new merchandise?—A. Correct.

Q. What do you call a good assortment?—A. A good assortment is to get the range of sizes like commencing with 4, 6, 8, 10, 12, and up to 22 plate, and a fairly proportionate—they are in a far better and more salable condition for the ultimate user.

Q. Now, as a result of these two abnormal characteristics, were the prices at which you disposed of them affected?—A. The price was affected by the unbalanced assortment and the quality of the merchandise.

Considerable testimony is in the record regarding transactions between Ralph Josephson and Rand Bros. in New York, N. Y., and several exhibits were admitted in evidence regarding these transactions. Some of these exhibits show a fictitious price for the chatons. We have examined all of this evidence and fail to see where any of it has any bearing upon the value of the involved chatons at or about the date of exportation of the same from China.

Examiner Golub testified for the Government that immediately prior to the date of exportation of the first shipment here involved, he received an importation of similar merchandise from Shanghai "* * * which was invoiced, entered, and appraised at 82 cents per mass, per basic size. The basic size runs from 4 to 12, sizes after 12 were higher in price." Examiner Golub testified that the only other information he had as to the value of this merchandise was gained from a study of the correspondence between the shipper and the importer.

In some of these appeals, the merchandise was entered at approximately four times the price at which it was entered in other of these appeals, and the Government insists in its brief filed herein that the appellant offered no evidence to explain such drastic change in market value for the merchandise. This entry was made on a *pro forma* invoice, and witness Louis Josephson testified that this invoice was sent to his brother at his brother's request and that the higher prices therein stated were used "*   *   *  to equalize our unequal opportunity to make a legitimate profit." The witness also explained that these higher prices did not represent the market value of the chatons and that the invoice was never intended to be used in making entry of the chatons or in any dealings with the customs.

X Q. This invoice that you have described as the "pro forma invoice," you say it was sent by you to your brother Ralph; is that correct?—A. Yes, sir.

X Q. For use in connection with the business transaction he had with another merchant in New York; is that correct?—A. Yes, sir.

X Q. Was it sent with the intention of being used for customs purposes?— A. No, sir.

X Q. It was not intended to be used for the purposes of making entries so far as you were concerned?—A. No, sir, never.

*       *       *       *       *       *       *

Q. Now, * * * will you explain if you can why you make customs entry on that entry [*pro forma* invoice]?—A. I made the entry for two purposes. One was because I wanted to cover myself as to our share of the business in connection with the joint venture with this concern. We were only getting a yield of 25 per cent apiece—that is my brother was getting 25 and I was getting 25—and the other folks were getting 110. Secondly, I made the entry for the higher amount with the thought in mind that the consular invoice would follow, and I was under the impression that I would make an amendment at the correct amount that would come through later.

It is clear to us from the testimony of Examiner Golub that the merchandise which he appraised shortly before the exportation of the involved merchandise, and upon which he testified he based his appraisement in the involved appeals, was regular merchandise in commercial assortments. The invoice in this previous shipment was not offered in evidence, nor is there any evidence to indicate that the merchandise covered thereby was freely offered for sale to all purchasers in the principal markets of China for export to the United States at the prices set forth therein, nor was there any evidence offered to explain the facts and circumstances connected with that invoice. *Sears, Roebuck & Co. et al.* v. *United States*, 31 C. C. P. A. (Customs) 36, C. A. D. 246.

It has been agreed between counsel that export value is the proper basis for the finding of values for the involved chatons. Consequently, there is no evidence in the record before us of any other basis

of value. Section 402 (d) of the Tariff Act of 1930 provides in part as follows:

(d) EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, * * *.

In *Brooks Paper Company* v. *United States*, 40 C. C. P. A. (Customs) 38, C. A. D. 495, the Court of Customs and Patent Appeals held as follows:

To sustain his burden of proof, and overcome this statutory presumption, it is incumbent upon appellant, the party challenging the value found by the appraiser in the first instance, to prove the action of the appraiser was erroneous and to establish some other dutiable value as the proper one. To do this, that party must meet every material issue involved in the case, and if he fails to do so the value fixed by the appraiser remains in full force and effect. *United States* v. *Gane and Ingram, Inc.*, 24 C. C. P. A. (Customs) 1, T. D. 48264, citing *United States* v. *T. D. Downing Co.* (*George H. Sweetnam, Inc.*), 20 C. C. P. A. (Customs) 251, T. D. 46057. It is clear, from a reading of section 402 (c) and (d), *supra*, that in order to prove foreign value or export value as a basis for a valid appraisement, *the appellant must establish, inter alia, the usual wholesale quantities* in which such or similar merchandise involved was freely offered for sale to all purchasers in the principal markets of the country from which exported, etc.

\*       \*       \*       \*       \*       \*       \*

Appellant's right to introduce evidence by means of affidavit is not questioned here. Congress has expressly given him the right to do so. See 19 U. S. C. § 1501 and 28 U. S. C. § 2633. However, these statutory provisions merely provide certain exceptions to the hearsay rule, and there is no evidence that Congress by so providing intended to change other established rules of evidence which apply to this court as to courts of general jurisdiction. *W. T. Grant Company* v. *United States*, 38 C. C. P. A. (Customs) 57, C. A. D. 440. Hence, the fact that the statement in question was introduced by means of an affidavit in no way affects the substantive question of whether or not the said statement is substantial evidence of the ultimate fact it seeks to establish.

\*       \*       \*       \*       \*       \*       \*

In view of the foregoing, we think the decision of the trial court was in error. The appellate division was, in our opinion, correct in holding that the evidence is insufficient to establish the usual wholesale quantities and that appellant has therefore failed to establish all the elements necessary for the court below to make a valid appraisement. Accordingly, the decision of the appellate division reversing the trial court is *affirmed*.

In affirming the appraised values for the chatons here involved, the trial court stated in part as follows:

The only other evidence in this record in relation to the export value of the involved merchandise is the testimony of Louis Josephson that the merchandise consisted of job lots of broken assortments of chatons and the prices shown on the consular invoices represent the actual purchase prices paid.

The invoice statements as to the purchase prices were before the appraiser and were disregarded by him when the appraisements were made in these cases. Accordingly, the evidence of prices paid, different in amounts from the appraised values, is not sufficient to overcome the presumption of correctness attaching to the appraised values.

Evidence was introduced, as heretofore shown, that the involved chatons were of broken assortments and were, therefore, not as valuable as assortments of chatons which were not broken, and it is contended we should give consideration to this fact in finding values for these chatons.

These chatons were before the appraiser at the time he made his appraisement, and we must presume that he made due allowance for the broken assortments in finding values for them. Be that as it may, it was incumbent upon the importer to prove that the action of the appraiser was erroneous and to establish some other dutiable value as the proper one. In order to prove an export value as a basis for a valid appraisement, it was the duty of the importer to establish, *inter alia*, the usual wholesale quantities in which such or similar merchandise was freely offered for sale to all purchasers in the principal markets of the country from which exported. This, in our opinion, the appellant herein has failed to do.

Counsel for appellant, in its supplemental brief filed herein, contends that the record establishes that the involved chatons were purchased as a job lot, or were in a damaged condition, or were in broken or noncommercial assortments, and insists that the purchase price should be accepted as the value of the chatons. Several decisions of this court are cited in support of this contention. It should be remembered that the only evidence we have in this case as to the value of these chatons is the testimony of Louis Josephson that the prices shown on the invoices represent the actual purchase prices paid.

Because of certain factual differences between this case and the cases cited by counsel for appellant, we do not consider those cases controlling here. In *Luigi Vitelli Elvea, Inc., et al.* v. *United States,* 9 Cust. Ct. 466, Reap. Dec. 5661, it was stated:

An examination of the values on the various invoices and contracts in the above-mentioned exhibits at dates approximately the same as the dates of exportation of the different shipments herein involved shows that the entered values in this case are the same prices at which the merchandise was sold for exportation, or offered for sale on the same, or approximately the same, dates of exportation, * * * .

We have no such evidence in this case, and this fact alone distinguishes the two cases. But even if the factual situation did not distinguish this case from the cases cited, we see no escape from the plain language of section 402 (d) of the Tariff Act of 1930, heretofore quoted. There is no showing in this case of any price at which such

or similar merchandise was freely offered for sale to all purchasers in the principal markets of China, in the usual wholesale quantities and in the ordinary course of trade, except that the purchaser actually paid the prices shown on the invoices.

Should we accept as correct the contention of counsel for appellant that the proper dutiable value of merchandise is the price actually paid by the purchaser, this would render meaningless most, if not all, the provisions of section 402 of the Tariff Act of 1930. This we decline to do.

While it is true that the evidence indicates that these chatons were purchased as job lots, and the record establishes that they were in a damaged condition, and in broken or noncommercial assortments, yet it is equally true that the evidence fails to establish any price at which job lots, damaged chatons, and chatons in broken or noncommercial assortments, or merchandise similar thereto, was freely offered for sale to all purchasers in the principal markets of China, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States. This being true, it is clear that appellant has failed to meet by proof the material issue in this case.

Upon a full consideration of the record, we find as facts:

1. That the involved merchandise consists of chatons exported from China and entered at the port of New York.

2. That said chatons were in a damaged condition, and were in broken or noncommercial assortments.

3. That the appellant herein actually paid for said chatons the prices shown on the invoices.

We, therefore, conclude, as matter of law:

1. That this record is wholly insufficient to establish the market value or the price at or about the date of exportation of such merchandise to the United States, at which such or similar merchandise was freely offered for sale to all purchasers in the principal markets of China, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States.

2. That, in the absence of evidence establishing that the action of the appraiser was erroneous and to establish some other value as the proper dutiable value of these chatons, the values fixed by the appraiser remain in full force and effect.

The decision and judgment of the trial court are accordingly affirmed. Judgment will be rendered accordingly.